FILED

Feb 23  3 03 PM '04

U.S. DISTRICT COURT
HAVEN, CONN.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RICARDO INHAN | : | CIVIL ACTION NUMBER: |
| PLAINTIFF | : | 302CV0213(GLG) |
| | : | |
| | : | |
| VS. | : | |
| | : | |
| NORTHEAST MARKETING | : | |
| GROUP, L.L.C., DEFENDANT | : | FEBRUARY 20, 2004 |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL

The Defendant in the above captioned case served the Plaintiff with a Request for Admissions dated December 2, 2003. See copy of Defendant's Request For Admissions attached hereto and marked Exhibit "A". The Plaintiff objected to the each of the seven separate requests on December 30, 2003. See Plaintiff's response attached hereto and marked Exhibit "B". The parties made good faith efforts to resolve the objections, with no success. See letter to Attorney Toddy from Attorney Offredi dated January 15, 2004, attached hereto and marked Exhibit "C".

Pursuant to Federal Rule of Civil Procedure Rule 36(a) "[t]he party who has requested the admissions may move to determine the sufficiency of the answers or objections. Unless the court determines that an objection is justified, it shall order that an answer be served." The

Defendant has made a good faith effort to obtain the answers without court intervention. See certification of Attorney Offredi attached hereto and marked exhibit "D".

The test for analyzing discovery disputes arising in the context of a motion to compel has been defined by the District Court as follows:

> "The district court enjoys broad discretion when resolving discovery disputes, which should be exercised by determining the relevance of discovery requests, assessing their oppressiveness, and weighing these factors in deciding whether discovery should be compelled." (internal quotation omitted) <u>Yancey v. Hooten</u>, Docket No. 3:97CV1400DJSTPS, United States District Court, District of Connecticut (May 5, 1998) (Smith, USMJ).

<u>The Defendant's first request was as follows</u>:

1.  Ricardo Inhan drafted the affidavit of Percy Curry dated June 18, 2001.

The Plaintiff objected that the request was "overly broad and vague. Additionally, this request is inflammatory and designed solely to annoy and harass the Plaintiff." Following a discussion between counsel as to what the word "drafted" meant Counsel for Plaintiff stated that the request was even more broad than once thought. The request is simple and to the point. The word "draft" is not complicated, overly broad or vague.

Counsel for Plaintiff further stated that regardless of the first objection, as to the term draft, that the Plaintiff is not willing to withdraw the second objection made to this request. The objection that the request is designed to harass and annoy the plaintiff is simply wrong. This fact

goes directly to the veracity of Mr. Curry's testimony and Mr. Inhan's credibility. There is nothing oppressive or irrelevant about the request.

Further, the allegation that the requests should have been addressed at the deposition of the Plaintiff is without merit, as the Federal and Local Rules do not prohibit one form of discovery over another. In fact, FRCP 26(d) entitled Timing and Sequence of Discovery expressly states that "Unless the court upon motion, for the convenience of justice, orders otherwise, **the methods of discovery may be used in any sequence**, and the fact that a party is conducting discovery, whether by deposition or otherwise, does not operate to delay any party's discovery". (emphasis added).

The Defendant's second request was as follows:

2.  Ricardo Inhan drafted the affidavit of Percy Curry dated March 28, 2001.

The Plaintiff objected on the same basis as the first request, and the Defendant reiterates the same argument herein.

The Defendant's third request was as follows:

3.  Ricardo Inhan solicited job recommendations prior to his departure from the Defendant Corporation.

The Plaintiff objected that "the request was overly broad and vague." Upon discussing the

request, the Defendant clarified that the request was not for recommendations made by the Defendant corporation, but recommendations the Plaintiff solicited *from others* prior to his leaving the Defendant corporation. The Plaintiff, even after the request was clarified, continues to object that it is overly broad and vague, and objects to the meaning of the term "solicit" as used in the Request. Plaintiff's objection has no basis and is simply dilatory. This request is narrowly tailored, and any objection that it is overly broad and vague is without merit, and should be overruled. In addition, there is nothing irrelevant or oppressive about the request that would warrant an objection.

The Defendant's Fourth request was as follows:

4.   Ricardo Inhan has not participated in any type of mental health counseling with a licensed professional during the time period he was employed by the Defendant or at anytime thereafter.

The Plaintiff objected that "the request has been answered by Plaintiff's Responses to Defendant's Interrogatories, dated December 2, 2002, and is therefore designed solely to annoy and harass the Plaintiff. Without waiving his objection, Plaintiff denies this request."

The request itself is narrowly tailored and entirely relevant as the Plaintiff has claimed emotional injury arising from his employment with the Defendant. Moreover, there is nothing oppressive about the request that would warrant it objectionable. It is noted that notwithstanding

the objection the Plaintiff denies the request. However, the Defendant requests the Court overrule the objection and order the Plaintiff to admit or deny.

Defendant's Fifth request was as follows:

5.  Ricardo Inhan and Percy Curry conspired to divide any settlement or award granted for the pending action.

The plaintiff objected that "the request is inflammatory and designed solely to annoy and harass the Plaintiff." The request is designed to learn the truth of whether Mr. Inhan and Mr. Curry have formulated any type of plan to divide any award from the action. The request is not, as Plaintiff claims, intended to annoy and harass, nor is it inflammatory. There is nothing irrelevant or oppressive about the request that would warrant it objectionable. A financial interest in the outcome is a basis to impeach a witness. The request goes to the credibility and veracity of Mr. Inhan, and the motivation of his key witness, Mr. Curry.

Defendant's Sixth request was as follows:

6.  Ricardo Inhan declares himself as Caucasian on his Government Tax Return Forms.

The Plaintiff objected that "the request is inflammatory, irrelevant to the action before the Court and designed solely to annoy and harass the Plaintiff." The Plaintiff has put his ethnicity at issue by filing his complaint. The request is, in fact, relevant as it goes to the Plaintiff's prior

characterizations of himself. Furthermore, the request is not oppressive, nor intended to annoy or harass. The Plaintiff's prior characterization of his ethnicity goes to the substance of his claims.

Defendant's Seventh request was as follows:

7.  Ricardo Inhan entered the United States illegally.

The Plaintiff objected that the request is "inflammatory, irrelevant to the action before the Court and is designed solely to annoy and harass the Plaintiff." The request itself is narrowly tailored and entirely relevant as it goes to the credibility and veracity of Mr. Inhan. Furthermore, the request is not oppressive. In addition, the request is not oppressive, nor intended to annoy or harass. The Plaintiff's prior characterization of his ethnicity goes to the substance of his claims.

THE DEFENDANT

BY: _____
ANGELA M. OFFREDI
Federal Bar No.: CT23964
Parrett, Porto, Parese & Colwell, P.C.
2319 Whitney Avenue, Suite 1D
Hamden, Connecticut 06518
Telephone Number:  (203) 281-2700
Facsimile Number:  (203) 281-0700

## CERTIFICATION

This is to certify that a copy of the foregoing has been mailed, postage prepaid, this 20th day of February, 2004 to:

Eugene Axelrod, Esq.
The Employment Law Group
8 Lunar Drive
Woodbridge, Connecticut 06525.

_____
Angela M. Offredi
Commissioner of the Superior Court

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RICARDO INHAN                    :        CIVIL ACTION NUMBER:
      PLAINTIFF              :        302CV0213(GLG)
                        :
                        :
VS.                              :
                        :
NORTHEAST MARKETING              :
GROUP, L.L.C., DEFENDANT         :        DECEMBER 2, 2003

### REQUEST FOR ADMISSIONS

      Pursuant to Federal Rule of Civil Procedure Rule 36 the Defendant hereby propounds the following requests for admissions to be answered by the Plaintiff.

1.     Ricardo Inhan drafted the affidavit of Percy Curry dated June 18, 2001. See attached.

**ANSWER:**

2.     Ricardo Inhan drafted the affidavit of Percy Curry dated March 28, 2001. See attached.

**ANSWER:**

3.     Ricardo Inhan solicited job recommendations prior to his departure from the Defendant Corporation.

**ANSWER:**

4.      Ricardo Inhan has not participated in any type of mental health counseling with a licensed professional during the time period he was employed by the Defendant or at anytime thereafter.

**ANSWER:**

5.      Ricardo Inhan and Percy Curry conspired to divide any settlement or award granted for the pending action.

**ANSWER:**

6.      Ricardo Inhan declares himself as Caucasian on his Government Tax Return Forms.

**ANSWER:**

7.      Ricardo Inhan entered the United States illegally.

**ANSWER:**

I:\Employment\NRTHEAST\Discovery\Req4Admissions.doc

THE DEFENDANT,

BY: _____
ANGELA M. OFFREDI
Federal Bar Number: CT23964
Parrett, Porto, Parese & Colwell, P.C.
2319 Whitney Avenue, Suite 1D
Hamden, Connecticut 06518
Telephone Number: (203) 281-2700
Facsimile Number: (203) 281-0700

## CERTIFICATION

This is to certify that a copy of the foregoing has been mailed, postage prepaid, this 2nd day of December, 2003 to:

Eugene Axelrod, Esq.
The Employment Law Group
8 Lunar Drive
Woodbridge, Connecticut 06525

_____
Angela M. Offredi
Commissioner of the District Court

I:\Employment\NRTHEAST\Discovery\Req4Admissions.doc



To whom it may concern,                                    06/18/01

My name is Percy Curry. I was employed by Northeast Marketing Group from May 1999- Dec 2000. I was hired as a salaried employee and my title was an "inside sales rep." My responsibilities consisted of helping customers with order information, checking product availability, shipping status, etc.. My daily work hours were from 8:00 a.m. to 5:00 p.m. Monday through Friday.

From the first couple of months I could see that there was favoritism showed to certain employees because there were certain rules for certain people and not others. At the time I was hired Patti worked from 8:00 a.m. till 2:00 p.m. but didn't usually report to work until after 8:30 because she had to get her children off to school was the reason that was given to me. I also had children whom I had to get off to school but was hassled by Don Boulden if I were 2 minutes tardy. This seemed strange to me but nothing was ever said to anyone else. LeeAnne also came to work frequently at around 9:00 a.m. to 9:30 a.m. and nothing seemed to be said to her either.

I remember when Ricardo Inhan was hired and the terms of him being hired because I told Byron Jr. about Ricardo. Ricardo visited the office and sat down with Byron Jr. and I remember Byron Jr. saying that he would be in contact with him. Shortly after Ricardo was hired by Northeast marketing on what seemed to be a temporary basis. Ricardo expressed that his schedule must be flexible because of his commute and because he sometimes had to take his son to school. He was assured that there would be no problem with a flexible schedule. Ricardo would fax a copy of his hours to Debbie Hull and they would pay him for the hours he faxed her. When Ricardo started Northeast had a website that was nooperational. I joked with Ricardo that he had alot work ahead of him. In a short time span he had the site looking awesome. Everyone was impressed with his work, especially Byron Sr. and Byron Jr.

Me, Ricardo and Rich Scavilla would often notice people coming in late or calling out sick for weeks at a time. Rich and me would be left to make up the work while they were out sick. Patti was out for a week with a back problem and Don was out 2 weeks with a sinus infection. Me, Ricardo and Rich were rarely sick and were always there. Some workers would be out so much the customers would comment that they must be part owners to miss that much time. Vacation days were also a mystery to us because it seemed like their vacation days were endless. Some employees even took vacation before they even had any. Don Boulden was hired after me and took 2 weeks vacation before I was even available to take a week. Donna also took vacation before she even had 6 months in, but nothing was ever said. Lee Anne took a 2-week vacation at in one shot on top of all the 2 days here or 3 days here she took through out the year. Anne Marie took vacation every other month and nothing was ever said to anyone. I got so out of hand that we started keeping track ourselves of how much time they missed on the monthly calendar.

After a while it was clear to see the only ones the rules were made for were Ricardo and I. On one occasion Ricardo had to take his son to school so he came in late and Byron Sr. yelled at him like there was no tomorrow. One day I stepped outside to get some fresh, and I wasn't outside one minute and Byron Jr. was outside telling me and Ricardo that it was unfair to the other workers and complained about us taking long breaks. The next morning Byron Sr. called me in the office and he complained again about us taking breaks. He said that he would be calling everyone in his office but no one else was called in his office. I complained to him about how many days Donna was missing and nothing was said about that or Donna, Patti and Anne Marie talking in Lee Anne's office for 20-30 minutes. He said that he didn't approve of it and he would take care of it. That same morning Donna showed up over 2 1\2 hours tardy for work and I watched from my desk to see if he yelled at her like he did Ricardo and me. He said good morning and smiled and walked away. Things of this nature happened on a regular basis. Anne Marie would call out for snow days complaining about how bad the roads were before there was even any snow on the ground. Ricardo would drive from Bridgeport and was there every time it snows and nothing was done about this.

Ricardo made the website work wonders, he made it do everything they wanted it to do despite he didn't always have the tools he needed to do the job. He pleaded with Byron Jr. to change from AT &T and go to Powershift, but he wouldn't listen. He would give Ricardo the information for his reports late causing the website to have outdated information on it. He would receive complaints about their email not working and Ricardo would tell him what he should do but he continued not to listen. Ricardo continued to make the website better even under these circumstances.

Ricardo and I always worked very hard and received complements from the customers. Byron Jr. told us at our Christmas gathering that he would sit down with us for our review in Feb. When Feb. came around I had to chase him for a month before I actually got my review. I felt sorry for Ricardo because he had to go through so much nonsense before he finally got his review. He didn't get his raise until around July or August. No one else complained because this was a perfect job for him or her. They came and left as they pleased and nothing was said as long as Rich ,Ricardo and Me continued to do the work. On one occasion Lee Anne even thought of quitting, she didn't report to work for over a week. She came back and nothing was said or done about the time she missed. The only person whose check was being cut was Ricardo's. I think he was treated very unfairly, we both were but I resigned before I allowed it to continue. I know I couldn't deal with as well as Ricardo did, time and time again. After the incident when Byron Jr. followed us outside, I resigned shortly after. I was tired of us doing all the work and being treated the worst in the company. I still don't understand we were treated so unfairly and the other employees got to do whatever they wanted. I hope that these unfair practices can be stopped because there's no room in the workplace, especially one the size of theirs for this kind of blatant discrimination to take place.

Sincerely,
Percy Curry

*Percy Curry*

State of Connecticut
County of New Haven
July 3, 2001

# Percy Curry's true statements about the Respondent's answers.

## Please Notice:

**I = Percy Curry / Respondent = Byron Jr. or Byron Sr. / Respondent = Northeast Marketing Group**

Note: I Percy Curry, worked for Northeast Marketing Group. I left the Company in December 15, 2000. I was hired prior July of 1999. This letter is to support Ricardo Inhan's Affidavit.

1) I am over 18 years old

2) The facts stated herein are true and correct to the best of my knowledge and belief.

3) I told Mr. Byron about Ricardo Inhan's programming background and stated that he was from Brazil about June of 1999.
I talked with Byron Senior Ricardo Inhan's national origin in June of 1999. I told him Ricardo Inhan was a programmer.

4) I gave to Byron Sr. Ricardo Inhan 's phone number and I know Byron Jr. called that number and talked to Ricardo Inhan about the position. Byron Jr. had kept Ricardo Inhan's phone number in his files, late June of 1999.

5) Paragraph 5 and 6 - Ricardo Inhan for the best of my knowledge was employed by Byron Jr. and Byron Senior as a programmer. He frequently introduced Ricardo Inhan to fellow workers as a Programmer for Northeast Marketing Group Web site operations.  Byron Jr. wanted Ricardo Inhan to develop a web site for Northeast Marketing. Ricardo Inhan was the only one, in best of my knowledge that knew how to execute that program, which relies heavily on computer knowledge.

7) Northeast Marketing Group address was 8 Fairfield Blvd - Wallingford, CT

8) I had knowledge that Ricardo Inhan was hired on hourly basis at that time of 15 dollars an hour. I knew that because Ricardo showed his check to me in 2 week he was working for Northeast Marketing Group.
Ricardo Inhan's schedule was very flexible because he had to bring his son to school and because of his long commute. I know that because I never saw Byron Jr. or Byron Sr. bringing up anything, or expressing anything that they had hired Ricardo Inhan to straight 40 hours. No one in the office worked straight 40 hours, only Rich Scavilla and myself. Byron seemed to be pleased that Ricardo Inhan took the position for Northeast even living so far away.

9) The Northeast web site was only a page at the time Ricardo started and I among all the employees didn't have any e-mail from that site. I know this because I went to the company address shortly after Ricardo Inhan took the position. The site was only a web page with the company logo, several e-mail addresses that didn't work, because some people even use AOL e-mail like Byron himself and his father. It seemed to me that it needed a whole new web site, I felt confident in Ricardo's abilities but I knew he had an awful task ahead of him.

10) Ricardo Inhan, to the best of my knowledge, was hired by the "word of the mouth." I know of no job application or contract of the best of my knowledge that Ricardo Inhan had done or signed. I myself was hired without filling out an application.
I helped Ricardo Inhan set up the desktop HP computer that he was going to be working on. To the best of my knowledge it was a new computer, but it didn't have any special software other than a regular software package with it.

11) The Web site was not working in the time of the Ricardo Inhan's time of hired. See more paragraph 9.

12) Correction on the paragraph 12. There's been a room that we all used for eating purposes. All the employees called it "cafeteria". In this room, called "cafeteria" Ricardo Inhan and I were having a conversation about Ricardo Inhan's farm life in Florida. Ricardo Inhan told me that he was paid 16 cents a basket of corn. Byron Jr. listened about the conversation standing near the door. He stated:"So, what we pay you is way too much" He walked away laughing. This happened shortly after Ricardo Inhan was hired and that was in a room that all employees used on the lunch break. We called it "cafeteria" even thought we didn't have a real one.

13) I heard Ricardo Inhan advised Byron Jr. about  AT&T not carrying some program ASP language and the e-mail could not have more than one dial up, because of the high price charged by each account.

14) One point in time Ricardo Inhan explained to me that ASP programming would be very cheap and more reliable to deal with. I saw him many times entering a lot of data from many reports. He complained to me that dial up was becoming absolite and it was slow to deal with.

15) Ricardo Inhan developed a database short after, but he spent a lot time inputting data from the reports. At that time no one had e-mail from the Web page. I also heard Ricardo Inhan and Byron talking about queries some time after that.

16) Ricardo Inhan told me about some database plan he designed to enter the database. He told me that he would present that to Byron and his father to organize the database inputting. I thought he needed that because it seemed for me a lot of work for one person

only to do. Some reports had over 1000 pages long. Because we worked together in some account numbers I saw Byron Jr. many times bringing a lot of reports to him to input.

17) See response to paragraph 16.

18) At times Ricardo asked me how to get a hold of Byron Jr., since he didn't respond his e-mails.

19) Ricardo's work seems difficult, but what I saw he had to do I expect a long time project.

20) I went to the site some times and I think Ricardo Inhan was very impressed with the job for the extensive data entry he had to maintain.

21) Byron Jr. held the reports because I heard them talking about it. In the beginning I noticed many reports being brought from Byron's office to Ricardo Inhan's station.

22) Some point in time, Ricardo Inhan told me the Power Shift would be cheaper and would deliver a fast result than AT&T did. He said the reports could be inputted faster that way.

23) I remember this new web site from Power Shift with water animation in front of the page. I thought that to be great looking. The queries also seemed to be working well.

24) When Ricardo Inhan starting using Power Shift, I went to see the results myself. I liked it very much. I also saw Byron looking the site from Ricardo Inhan's computer. He was very pleased and I congratulated Ricardo Inhan shortly after.

25) To my knowledge, Ricardo Inhan was doing a good job for the tremendous amount of data he had to input. I also saw Byron Jr. and senior happy with the site.

26) Ricardo Inhan helped other people in the Company because they weren't computer literate people. I saw him frequently helping Don Boulden. One time Don Boulden's computer had a serious problem, which he had to use Ann Marie's computer while she was at lunch. Ricardo also helped Lee Ann, Rich Scavilla and Byron Sr. He always helped these people anytime they needed help. It's true that he rescued co-workers with little or no knowledge to how to use a computer.

27) The Moving Company only moved heavy furniture during the weekend. They did not move many hundreds of catalog and electrical samples, besides other heavy material and some heavy metal shelves. I saw Ricardo Inhan helping with that. I made numerous trips from the old building to the new building, carrying binders and other belongings of my fellow employee's. Not one female assisted in the moving on that day. (Donna, Anne Marie, Lee Anne or Patti)

The ones that most worked in moving in May 19, 2000 were, in order: **Don Boulder,** Byron Jr., Vincent Mooney and Ricardo Inhan, Steve (the outside salesman) and I helped a little because I was on the phone most of the time. The other employees, **Donna,** Lee Ann helped setting up some of the stuff, once it was in the other building. **None** of the other employees assisted in the moving. Byron Jr. knew about the moving **months** before, but he seems not ready for it at all. He was visibly upset and rushing to meet the deadline on Monday. He told me that I would stay on the phone while Ricardo Inhan would be doing the moving along with Don Boulden, but I knew I would end up doing the bulk of the work because I was the youngest and strongest of the other employees.

On May 18, 2000, I was told to come with Jeans and sneakers in the next **day** for the moving with no chance to express my opinion. The next day I did come with working Jeans so was Ricardo that was also asked to help in the moving. It wasn't **clear** really what we would be doing because I was told by Byron Sr. that the company was **hiring** movers. I saw Ricardo packing his desk and computer to be moved to the next **building.** I moved heavy metal shelves, filled with catalogs. I saw Ricardo helping **Don Boulden** and Vincent Mooney to clean the catalog room. I also cleaned and moved **a lot of** heavy stuff in another side rooms, which had many heavy materials and electrical samples. The moving that took place in the weekend I was not present. Byron Jr. **told me that** he expected to have gotten a lot more accomplished than what we had done.

28) See 27 explanation. Ricardo helped in the moving.

29) And 30) See 27 explanation.

31) And 32) See 27 paragraph.

33) Ricardo told me he had his review the Byron Jr. days after and he **was denied** any raise, related with the Internet work, this was after his review, couple **of days** after the moving.

34) Ricardo told me he had his review the Byron Jr. days after and he **was denied** any raise, related with the Internet work.

35) I think he was mad with Ricardo because he didn't help him the way he thought he should on the moving process. Even then, when Ricardo helped assembling one of those cubicles with Lee Ann Don Boulden and myself in the other office. I think **he** denied Ricardo the raise that he promised in that job review, it was because **of the** moving.

36) The Respondent forgot that "Inside Sales" included only 8 people **working** at that location at that time, These people were physically working in that **office.** Byron Jr. and Byron Senior are the owners of the Company, so they don't count as **raises** concern. Vincent Mooney is an outside sales person, therefore is subjected to **outside** sales reviews for a pay raise. Vincent Mooney didn't report to Wallingford on a **daily** basis because his work is as an outside person. Byron Jr. promised on Christmas Eve. 1999, that he would sit down and give all employees a salary raise starting in Feb.2000. I went to

Byron Jr. on three different occasions before I was able to get my review. Donna Papelo, that came to work for the Company almost a year after Ricardo was hired in the company.

37) I witnessed Ricardo being late a couple of minutes but this was nothing compared to others being out sick for weeks at a time. Many employees left early leaving me, Rich, Ricardo and Don, although Don hardly did any work or had any knowledge of the system. My responsibilities were greater than my coworkers because my knowledge of the computer systems. I processed a greater volume of orders than all other employees did because the work was not evenly distributed. When I walked by Ricardo's cubicle he was always hard at work, sometimes working past quitting time. Lee Ann always came late so was Patti, Donna Papelo and Don Boulden. Rich Scavilla and I came on time. One day, I had just called my wife and Byron Senior asked "Who are you talking to" I told him:"My wife." and he shouted at me to get off the phone. Although other employees talked on the phone with their families on a daily basis. Many times Ricardo's calls weren't passed on to him. One day, I saw Mr. Byron Senior shouting at Ricardo outside for coming late.

38) Lee Ann took tremendous time off from work. That's no question about it. When her sons got sick she used to take time off as well extended vacations. One time I asked by a customer if Lee Ann owned that office for being so long out of work. One of the reasons that Mrs. Lee Ann's testimony about Ricardo being late, or out for over 30 days should not be considered as true, was the fact, that she was the leader in tardiness. I was always at work much time before her, just about every day.
One occasion she had a personal problem with Byron Jr., before we moved to the new location and she was absent for almost a whole month. When she came back to work, nothing was said, neither she was reprehended with that time off.
Vincent Mooney never reported to the Wallingford office on a daily basis. He was an outside salesman.

39) Ricardo told me that he would try to work out things with Byron Jr. before filing a complaint to the State of Connecticut around August 2000. I have no knowledge of what was the result of that complaint.

40) Don Boulden printed a monthly calendar of who was taking vacation time, training or other things of that nature. Everyone was to receive a copy of the calendar. I don't think Ricardo was ever given a copy because he always asked if Don Boulden had given us a copy.

41) Ricardo came to me around December of 1999, and told me he overheard a conversation with Bonnie Hill, the payroll accountant and Mr. Byron Jr. about placing him on a salary basis. This seemed very strange to me, because it was my understanding that everybody was already on salary.

42) And 43) See paragraphs 8 and 41

44) I know that Ricardo always had called when he became late. I witnessed Ricardo hardly being out of the office besides being couple of minutes late.
One day saw Ricardo arriving at 11:15 am. He called me to go on lunch at 12:30 am, his usual lunchtime. When he called me to go Senior said: " How do you have the guts to take lunch?" He also said: "If you continuing like that we'll have to cut your salary again". Indeed, it happened. In the following check they also cut his salary, because Ricardo Inhan show Rich Scavilla and me his paycheck.
Our lunch hour is 12:30 p.m. It has always been. That part of the conversation took place near the file cabinets, very far away from Lee Ann's office. Mrs. lee Ann's was talking on the phone at that time.

45) And 46) See Paragraph 44

47) Ricardo showed his check and I saw they had cut his wages. I was baffled, because I had never heard of a salaried employee having their wages cut. I thought that it was very unfair that his salary was cut especially after how much time other coworkers were missing from work. Ricardo had a meeting with him about the wage cut, and I was sure Byron Jr. would pay him back his money.

48) See paragraph 8. As anything related to these matters, Northeast Marketing Group didn't have any Booklet rules, so all this was done by the "word of the mouth". The Booklet only appeared December 2000. In a matter of fact, none of my co-workers except Rich Scavilla and myself did work 40 hours as a whole. The office staff came late, took extended vacations and sick days off, that was common among all these employees because some had kids or some related schedule problems. Lee Ann lives in New Haven and arrives late everyday to work.

49) See paragraph 48, see also paragraph 8. Ricardo was a salaried employee as the rest of the Inside Sales were.

50) The "breaks" we are speaking here is not lunch breaks. They are regular conversation between employees during working hours. All the employees had an extended conversation inside the office at times.
This meeting between Byron Senior and me indeed took place. Byron Sr. told me that people were not answering the phones and Ricardo and me were spending too much time together. I was warned by Byron Senior forbidding me in talking to Ricardo in my cubicle or in the cafeteria during the work hours. He also said to me that he would hold a meeting to all inside sales people about such problems as he did with me. That day Donna Papelo came late, for over 3 hours. Byron Senior said nothing to her as I watched they talked and laughed together. The Company meeting never took place with the other co-workers. I felt that Ricardo and me were the only ones two non-Caucasian employees who were told we could not talk and take these breaks together.

51) One day, I felt a little sick. I went outside for not even a minute for a fresh air. I noticed Ricardo following me outside. Byron Jr. followed us and asked: "...people were complaining about you being together." Ricardo asked him what he meant by that. He said to us, that people were complaining about us and he thought that was unfair for the rest of the staff, so we should stop. Indeed, I stopped to talking to Ricardo for a while. On that afternoon, Donna, Ann Marie and Lee Ann did talk in Lee Ann's office about non-related work conversation for over 30 minutes straight, as Ricardo and me watched them doing it. The phones were ringing and no one called their attention on that matter.

52) I agree with. I was the only non-Caucasian employee that was of African American decent.

53) The Respondent said I resigned on December 15, 2000 after he found a job offer. I looked hard to find a job because I was seeing the harassment coming to me also. I told Ricardo that I could not take the way he was enduring. The allegations against me using improper Internet web sites are not true. That is only to hurt my reputation in order to discredit me as a witness. The day that I left I told Byron Jr. that I didn't like the direction to where this Company is going. Byron also was angry with me, because I was leaving without notice.
I didn't give the 2 weeks noticed because I felt Mr. Byron would cut my salary too and perhaps if someone had called from my new job Mr. Byron and senior could damage my reputation in order to prevent me to get a job. This in fact happened in the past, when someone at Bryant asked how I was doing. Byron Jr. or Senior said "He was not doing anything new for the Company..."

54) There was no booklet prior December of 2000. The list of signatures to knowledge of the manual was only signed around December 5, 2000.

55) I agree with Ricardo's Affidavit in this paragraph. See paragraph 54

56) See paragraph 48. The week that I left, December 15, Ricardo came to Rich and me and showed us his check. His salary was indeed short some hundreds of dollars.

57) I believe Ricardo is telling the truth in this paragraph. See paragraph 48 and 41.

58) I left December 15, 2000. Ricardo and I were the only employees that were reprehended while I was working at Northeast Marketing. I told Ricardo later in conversation that no Christmas bonus sent to me in the mail either.

59) I agree with Ricardo in this paragraph.

60) Byron Jr. and his father did promise me many things they didn't deliver.

61) I believed Ricardo was doing an excellent job on the web site.

62) I agree with Ricardo's Affidavit in this paragraph. He told me he would ask for a raise.

63) Ricardo went to me one day and he told me he got the raise. He was very happy.

64) Short before I left, Ricardo told me that he would never expect to see any of his salary cuts be paid back to him.

65) I was not there on December 26, 2000 but everyone was always paid on holidays, sick days or vacations.

66) See paragraph 65.

67) It seems to me that Ricardo never had any supervisor because no one else knew how to do his work.

68) Ricardo always reported before leaving early for any reason.

69) See paragraph 67 and 68.

70) See paragraph 67 and 68. In addition to that Ricardo was a salary employee see paragraph 8. All employees some time had off days related with sickness in the family. Patty's mother made her loose a lot of working days.

71) I was not employed there December 28,2000. Lee Anne always arrived late for work.

72) See answer paragraph 65.

73) We agree in this paragraph 73.

74) See paragraph 53.

75) I agree with Ricardo's Affidavit in this paragraph.

76) I agree with Ricardo's Affidavit in this paragraph.

77) I agree with Ricardo's Affidavit in this paragraph. See paragraph 51

78) No memos or time sheets were passed out to regards to tardiness. The Respondent claims that Ricardo had to work 40 hours. None of the office staff worked extra hours when they were late or missed time.

79) See paragraph 8. Ricardo was a salaried employee like the others. I know that after Bonnie came to work at Northeast Marketing we all were salaried employees in Inside Sales.

80) To my knowledge, Ricardo was the only one that received a wage cut.

81) I agree with Ricardo's Affidavit in this paragraph

82) I agree with Ricardo's Affidavit in this paragraph I agree with Ricardo's Affidavit in this paragraph .I feel the Respondent is in violation of the Title VII for retaliating against me due to Race and Nationality.

83) I agree with Ricardo's Affidavit in this paragraph.

84) I agree with Ricardo's Affidavit in this paragraph .I feel that the Respondent is in violation of the Title VII for retaliating against me for my continual complaints of Northeast marketing group unfair employment practices.

85) I agree with Ricardo's Affidavit in this paragraph .The Respondent is in violation of C.G.S 46(a)(1) for discriminating and retaliating against me, in terms of my employment due of my nationality and my race.

86) I agree with Ricardo's Affidavit in this paragraph .The Respondent is in violation of C.G.S 46(a)(4) for discriminating and retaliating against me due to my repeated complaints against Northeast marketing Group unfair employment practices.

87) I agree with Ricardo's Affidavit in this paragraph .The Respondent is in violation of C.G.S 46(a)(1) for retaliating against me in fair compensation due due to my nationality and race.

88) I agree with Ricardo's Affidavit in this paragraph .The Respondent has violated the C.G.S 46(a)(5) for discriminating and retaliating against me, in terms of my employment due of my nationality and my race.

Percy Curry.
March 28, 2001

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RICARDO INHAN,                :    CIVIL ACTION NO:
                                 :    3:02CV0213 (GLG)
           Plaintiff,    -    :

VS.                        :
                                 :

NORTHEAST MARKETING GROUP,    :
                                 :
           Defendant.      :    December 30, 2003

### PLAINTIFF'S RESPONSES TO DEFENDANT'S REQUEST FOR ADMISSIONS, DATED DECEMBER 2, 2003

### GENERAL OBJECTIONS

Due to their adversarial nature, Defendant's requests appear to serve as a substitute for the continued deposition of Ricardo Inhan. Defendant could have completed the deposition of the Plaintiff pursuant to the protective order, ordered September 23, 2003. Additionally, the Defendant waited until four (4) days before the close of discovery to serve the Plaintiff with said requests, all of which concern information that reasonably could have been requested long before the close of discovery. Finally, Defendant's requests for admissions "are so totally improper that no useful purpose will be served by either forcing [the plaintiff] to respond or otherwise penalizing [the plaintiff]." Williams v. Krieger, 61 F.R.D. 142, 145 (S.D.N.Y. 1973).

1.    Ricardo Inhan drafted the affidavit of Percy Curry dated June 18, 2001. See attached.

ANSWER:

OBJECTION: This request is overly broad and vague. Additionally, this request is inflammatory and designed solely to annoy and harass the Plaintiff.

3

2.    Ricardo Inhan drafted the affidavit of Percy Curry dated March 28, 2001.  See attached.

**ANSWER:**

OBJECTION:  This request is overly broad and vague.  Additionally, this request is inflammatory and designed solely to annoy and harass the Plaintiff.


3.    Ricardo Inhan solicited job recommendations prior to his departure from the Defendant Corporation.

**ANSWER:**

OBJECTION:  This request is overly broad and vague.


4.    Ricardo Inhan has not participated in any type of mental health counseling with a licensed professional during the time period he was employed by the Defendant or at anytime thereafter.

**ANSWER:**

OBJECTION:  This request has been answered by Plaintiff's Responses to Defendant's Interrogatories, dated December 2, 2002, and is therefore designed solely to annoy and harass the Plaintiff.  Without waving his objection, Plaintiff denies this request.


5.    Ricardo Inhan and Percy Curry conspired to divide any settlement or award granted for the pending action.

**ANSWER:**

OBJECTION:  This request is inflammatory and designed solely to annoy and harass the Plaintiff.


6.    Ricardo Inhan declares himself as Caucasian on his Government Tax Return Forms.

**ANSWER:**

OBJECTION:  This request is inflammatory, irrelevant to the action before the Court and designed solely to annoy and harass the Plaintiff.

4

7.      Ricardo Inhan entered the United States illegally.

**ANSWER**:

OBJECTION:  This request is inflammatory, irrelevant to the action before the Court and is designed solely to annoy and harass the Plaintiff.

The Plaintiff,
Ricardo Inhan


By: _____
Eugene N. Axelrod, Esq.  (CT00309)
The Employment Law Group LLC
8 Lunar Drive
Woodbridge, CT  06525
Tel. (203) 389-6526
Fax (203) 389-2656

## CERTIFICATION

        This is to certify that a copy of the foregoing has been mailed this date, postage prepaid, to the following:


Angela M. Offredi, Esq.
Louis M. Federici, Esq.
Parrett Porto, Parese & Colwell, P.C.
2319 Whitney Avenue, Suite 1D
Hamden, Connecticut 06518


12/30/03                                           _____
Date                                                Eugene N. Axelrod

5

## PARRETT, PORTO, PARESE & COLWELL
### PROFESSIONAL CORPORATION
### ATTORNEYS AND COUNSELLORS AT LAW

ANGELA M. OFFREDI
aoffredi@pppclaw.com

ONE HAMDEN CENTER
2319 WHITNEY AVENUE
HAMDEN, CONNECTICUT 06518

(203) 281-2700
FAX: (203) 281-0700
WWW.PPPCLAW.COM

January 15, 2004

VIA FACSIMILE 389-2656
Melissa Toddy, Esq.
The Employment Law Group, LLC
8 Lunar Drive
Woodbridge, Connecticut 06525

Re:    Ricardo Inhan vs. Northeast Marketing Group, LLC

Dear Attorney Toddy:

As a follow up to our discussions regarding Plaintiff's objections to Defendant's Requests for Admissions, I would like to reiterate the following: With respect to Requests Nos. 1 and 2, you have advised me that your objection that the word "drafted" is overly broad and vague is not resolvable and requested that I attempt to narrow the meaning of "drafted." You further stated that the second objection on Nos. 1 and 2 that these requests were designed to annoy and harass the Plaintiff were objections you were not willing to withdraw.

With respect to Request for Admission No. 3, you stated that your were standing by your objection as in your opinion I have not made clear what the word "solicit" means. In addition, we were unable to resolve the objections to Requests 4 through 7.

If this does not accurately depict our discussions of the objections, please contact me immediately. I look forward to speaking with you regarding the same.

Very truly yours,

Angela M. Offredi
AMO/jms
cc:    Northeast Marketing

I:\Employment\NRTHEAST\LETTERS\Toddy5.doc

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RICARDO INHAN                          :        CIVIL ACTION NUMBER:
           PLAINTIFF                 :        302CV0213(GLG)
                                       :
                                       :
VS.                                    :
                                       :
                                       :
NORTHEAST MARKETING                    :
GROUP, L.L.C., DEFENDANT               :        FEBRUARY 10, 2004

## CERTIFICATION RE: DEFENDANT'S MOTION TO COMPEL PLAINTIFF'S DISCOVERY COMPLIANCE

The undersigned hereby certifies pursuant to FRCP 37(a), that she has made a good faith effort to resolve the disputes regarding the plaintiff's failure to comply with discovery. Those issues have not been resolved.

1.  The undersigned, on behalf of the Defendant, served the Plaintiff with a Request for Admissions dated December 2, 2003.

2.  The Plaintiff objected to each and every request on December 30, 2003.

3.  The undersigned telephoned, and spoke with Attorney Toddy, counsel for Plaintiff, on two separate occasions the week of January 12, 2004 to resolve the disputes.

4.  The parties were unable to resolve the plaintiff's objections, as evidenced by a letter from the undersigned to Attorney Toddy dated January 15, 2004.

ANGELA M. OFFREDI

Subscribed and sworn before me on this 10th day of February, 2004.

Commissioner of the Superior Court